Michael Bruggeman, you may proceed when ready. Good morning, Your Honor. Good morning. Please, the Court, the Council. My name is Michael Bruggeman. I represent the Minnesota Housing Finance Agency. I'd like to reserve three minutes of time for rebuttal. In recognition of the fact that refurbishing housing is more cost-effective than building new homes, MHFA operates one of the larger public agency fix-up fund loans in the country. Through this program, MHFA improves neighborhoods through long-term below-market fixed interest rate loans. Such a loan is at issue in this case. The Appalese obtained a loan for $34,000 in 2005, and in 2010, after paying down roughly $8,000 of principal, 2012, sorry, filed bankruptcy in a Chapter 13 plan, and the bankruptcy court stripped MHFA's lien, and the plan itself offered very little repayment of the principal debt. Minnesota Housing objects to this, and it's impermissible under Section 1322b2 of the Bankruptcy Code. 1322 of the Bankruptcy Code provides that a plan may modify the rights of holders of secured claims other than the claims secured only by a security interest in real property, that is, the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims. The majority of courts, including the District Court, which have interpreted this section, have made two significant errors in interpretation, errors that are determinable from reviewing the Supreme Court's prior decision, the 1993 decision in Nobleman. The first major error is that the courts do not credit the term claim as used in the second clause of 1322b2. The term claim is a defined term under the Bankruptcy Code, under Section 105 of the Bankruptcy Code. A claim is a right to payment whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, immatured, disputed, undisputed, illegal, equitable, secured, or unsecured. A claim is agnostic as to the security, whether it's secured or unsecured, by definition of 506. 1322b2 uses the claim secured in the second clause, and that's the starting point of defining the scope of protection under 1322b2. The second major error... Why is that the starting point? Why isn't 506 the starting point? That is the second major error, is the 506. And that arises, and that gets to the core of the dispute, in which courts say that the protection only arises if the party seeking protection is the holder of a secured claim defined under Section 506. There are two arguments courts have relied on to make this finding. First, there is a paragraph in Nobleman which addresses 506. And the second is the structure of the statute which discusses holders of secured claims and holders of unsecured claims. One of the most under-cited passages of Nobleman occurs right before the court's discussion of Section 506a. And in that section... All right, which section are you in? Which part of the opinion? I am in Part 2 of the opinion. Which paragraph? I am in the third paragraph. Had note 3, this interpretation fails? Correct. All right. That's the under-cited part? The most under-cited statement in this is the court saying, by virtue of its mortgage contract with petitioners, the bank is indisputably the holder of a claim secured by a lien on petitioners. So notwithstanding the parties identified specifically in 1322, holders of secured claims and holders of unsecured claims, Nobleman recognizes the holder of a third category, a claim, holder of a claim secured by. Nobleman further then goes on to recognize the code definition of claim as broad, meaning both secured and unsecured. Nobleman goes on to identify that a claim secured by is not defined by terms of 506, does not mean the same thing as secured claim. This is one of the passages that the appellate courts and the district courts have completely understated. By virtue of the mortgage contract, the bank is indisputably the holder of a claim. It overrides the argument that either we have to be placed in... that if we are not placed in as a holder of a secured claim, that we necessarily are only a holder of an unsecured claim. Nobleman, by its very text, gives us the third option, in that we are the holder of the claim. And this interpretation endorsed by Nobleman is much more consistent with remaining elements of textual interpretation that you would engage in the legislative history, which aimed to broadly protect mortgages from the modification processes of Chapter 13, as well as other principles that the Supreme Court has endorsed in interpreting lien stripping and valuation provisions. Why do you think the second clause of 1322b2 is not a subset of the first clause? It's a subset to the extent that it's going back to discussing the rights of holders. Justice Thomas in Nobleman says the real focus on Section 1322 is rights of holders. There is a reasonable reading... But on that view, there are two types of holders, not three types. And that's where we disagree. We think Justice Thomas acknowledges a third type of holder. He says there's a holder of a claim secured by it. Well, I mean, there might be such a holder, but it's not one that's mentioned in b2, is it? Or if it's mentioned, it's mentioned as a subcategory of holders of secured claims. That's not how we read it. I don't see Nobleman as expressing that anywhere. Nobleman doesn't say, express anywhere, that only a holder of a secured claim is entitled to this protection. Several courts have misinterpreted Nobleman and misread it to say that Nobleman expressly holds and expressly instructs all courts that the starting point of inquiry in defining the protection provided by the second clause is to determine whether or not the party is the holder of a secured claim by 506A. However, the language that's frequently cited to support that, it does not say that at all. It merely says, after the acknowledgment that the bank is indisputably the holder of a claim secured by a lien, it says petitioners were correct in looking to Section 506A for judicial evaluation of collateral to determine the status of the bank's secured claim. It was permissible for petitioners to seek evaluation in proposing their Chapter 13 plan since Section 506A says that such value shall be determined in connection with any hearing on a plan affecting such creditor's interest. But even if we accept the petition's valuation, the bank is still the holder of a secured claim because the homes retains $23,500 of value. The portion of the bank's claim that exceeds $23,500 is an unsecured claim component. Then he goes on to, after acknowledging and walking through the premise by premise, the argument that the petitioner's nobleman presented to court, the court goes on to say, however, that determination, the determination under 506A does not necessarily mean the rights the bank enjoys as a mortgagee, which are protected by Section 1322B2, are limited by the valuation of its secured claim. The courts that have read this provision acknowledge that it's at best ambiguous, that there is an ambiguity there, and particularly completing the argument, completing the soliloquy that Justice Thomas does, he goes on to conclude that it's somehow not relevant to the case at issue. It somehow does not limit the scope of the rights the creditor had in that case. And the issue going past nobleman has been, well, how do courts then, in turn, limit other mortgages who are holders of claims secured by, who have claims as defined under the code, whether secured or unsecured? We feel that that's a better interpretation of what we call the Section 506A paragraph in nobleman than that it lays out a condition precedent to defining the protections of Section 1322B2. It's also consistent with the legislative history, which, going through it, this was all enacted as part of the 1978 enaction of Chapter 13. Chapter 13 sought to promote payment plans, sought to impose the cram-down remedy, where secured liens going forward would be defined by the value of the collateral. However, it's clear that the home mortgage industry successfully lobbied for protection as part of that process. And the legislative history acknowledges that protection broadly, as it does in nobleman. It acknowledges that a claim secured by a mortgage, an otherwise qualifying mortgage, shall be treated under Section 1322B5, which is the provision that doesn't allow cram-down, but it allows a debtor to cure delinquent payments as part of its Chapter 13 plan. The legislative history by appellate courts who have reviewed this issue subsequent to nobleman has been misdirected. And this court recently in its circuit in the In Re Shelton case made clear that when we are looking at legislative history in bankruptcy code cases, that there are certain interpretive principles that we follow. For instance, bankruptcy code provisions should not be read in isolation from one another. They should not be read in isolation from precode practices. As a general principle, valid liens passed through bankruptcy are ineffective, and Congress must not have intended to legislate contrary to this general principle without at least some explanation of such intent in the legislative history. The courts that have looked at 1320, and these principles come from this 1992 Supreme Court case in Dewsnip, where under 506, an attempt to strip a lien was denied. The courts have not followed these principles.  The legislative history can be read in both ways, and therefore it's an adverse inference against the creditor. That's reversed. It should work in the other direction. Do you agree that every circuit that's looked at this issue has held contrary to your argument? The seven circuits which have looked at this issue have ruled contrary, subject to the one qualification that the 11th Circuit had two cases going on at the same time, and one ruled in favor of the Appley's argument. One signified that it would have ruled differently, but it would rule in favor out of deference to the first decision. What's the case that favors your view? I'm sorry? What's the circuit court case that favors your view? That was the 11th Circuit case Dickerson, but it stripped the lien in Dickerson. It just merely said that it didn't agree with stripping the lien. It was doing so out of deference to a different 11th Circuit case, Tanner, which was decided at the same time. The outcome of the case was contrary to your view? In Dickerson, correct. Correct. The outcome is different. I read at least somewhere it was perhaps the Appley has noted, or I read it somewhere else, that the Supreme Court has had an opportunity to correct what you view as this misinterpretation, but has declined to do so. It's had that opportunity on a couple of occasions. What do you think we should make of that? Well, there hasn't been a circuit split. As you correctly noted, the Dickerson case decided favorably towards Appley, so there's no circuit split to create an opportunity where we expect the Supreme Court to review the issue. I'd like to reserve the remainder of time for rebuttal, if possible. You may. Thank you. Very well. Thank you. Mr. Tyson, we'll hear from you. May it please this Honorable Court, this is not a complicated case. The analysis comes down to two statutes, one sentence each, and one Supreme Court case which is entirely instructive, yet factually distinguishable. The very first sentence of Nobleman informs that the case is centered on the interrelationship between Section 506 and Section 1322B2. Nobleman focuses on the rights of the holder of a secured claim, in turn, to Section 506, but the claimant there was secured, albeit partially secured. The Minnesota Housing Finance Agency is arguing that Nobleman does not require a 506 analysis as a condition precedent, but in fact, Nobleman says it was correct to first look at Section 506 to determine the status of the secured claim. All of the language that the appellant is relying upon results from the fact that the lien in Nobleman was partially secured. Now, a claim can be secured, it can be unsecured, or it can be both. In Nobleman, it was both, and that's the particular fact pattern in that case, which is why the Supreme Court did not feel obligated to apply the so-called rule of last antecedent. Nobleman states the more reasonable interpretation is to read a claim secured only by a homestead lien as referring to the lien holder's entire claim, including both its secured and unsecured components, since it would be impossible to cram down without modifying the mortgagee's contractual rights as to interest rates, monthly payment terms, etc. In Nobleman, the debtors could not modify the contract terms of the unsecured component without also modifying the terms of the secured component. As Judge Montgomery concluded in the trial court here, the homestead lien with no equity has only an unsecured component, and thus the lien holder is not the holder of a secured claim under Section 1322B2. The case law supporting lien stripping goes back almost 15 years. Appellant's arguments are not novel and have been tried unsuccessfully for 15 years, and there's no reason to now create a split in well-settled authority. Congress certainly could have rectified the situation as this has been going on across the country and even here in Minnesota for a decade. Well, in Minnesota, of course, there were some older cases, and with the economy it got bigger here in Minnesota in the last five years or so, but there's been a lot of cases in the pipeline that have gone through, and now there's a new rule that's been promulgated in Minnesota as well. The Minnesota Housing Finance Agency took a third mortgage. Does that really make them secured? They engage in risky lending, and it's still subject to Title XI of the United States Code. Does taking a second or third lien in a car really give a lender a secured position? The security there is illusory. They're designed to give the collateral owner the fear that if they don't make the payments, they're going to lose the collateral when, in fact, the lender has no intention of pursuing the collateral. That's a common-sense interpretation. It's a literal interpretation before you even look at Section 506, and 506 is also consistent with common sense. Now, granted, if the property appreciates or the first lien is paid down, then there becomes value and security. In this case, that may happen many years down the road, but we can't determine what may happen in the future because valuation is based on the petition date. My clients are not getting any sort of a windfall. They're getting a $140,000 house that is subject to a $154,000 first mortgage, and the appellants do retain their contingent lien rights for the duration of the lien plan because my clients do need to continue and make their plan and not get dismissed or converted in order to enjoy the full benefits of the lien strip. Now, sometimes when there's a lien strip, an undersecured creditor such as this can actually get 100% if the debtor has sufficient cash flow, so it becomes a function of what the debtor can afford to pay. In this case, it just so happens that the third mortgagee is being paid a 2% dividend consistent with all other unsecured creditors in light of the debtor's low income. Permitting lien stripping accomplishes a noble goal of keeping people in their house because without it, these homeowners, like many others, would likely just be another foreclosure in Chapter 7 statistic. Now, I understand the competing goal of encouraging the flow of capital into the home improvement market, but a lot of these second mortgages that we're seeing were taken out when people were using their houses as piggy banks. And if a junior mortgagee is partially secured, even to the extent of a dollar, regardless of why the people took the money out of their house, whether it was for a vacation or for a fix-up or whatever, then that goal of encouraging the flow of money into the home ownership market is accomplished because where there's partial security, people don't have a remedy in Chapter 13. But where it turns out that the lender took risks and it's risky lending and there's no equity to support that, then Chapter 13 gives these types of homeowners a remedy and permits them to keep their house. In conclusion, unless there's any other questions, I would urge this Court to affirm Judge Montgomery's decision and follow all of the other circuit court cases on this matter. Okay, very well. Thank you for your argument, Mr. Tyson. Mr. Bruggeman, we'll hear from you in rebuttal. Your Honor, in the year after Nobleman was decided in 1994, Congress enacted Section 1322C2 as a limitation on the Anti-Modification Clause 1322B2. 1322C2 states that in the case, notwithstanding subsection B2 and applicable non-bankruptcy law in the case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property, that is the debtor's principal residence, is due before the day of the final payment, the plan may modify that claim under Section 1325A5. There's two significant points to that. First of all, textually, Section 1322C2 defines standing by the party with a claim secured only by a security interest in the real property. It goes to the claim secured language. It doesn't talk about the holder of a secured claim. And that, therefore, conforms with our argument that standing under 1322B2 ultimately originates from the holder of a claim, not the holder of a secured claim. Secondly, 1322C2 enacted right after Nobleman, enacted when there were no circuit court decisions. Those didn't come until the 2000s, so seven years before we started seeing circuit court decisions on this issue. When we had a closer case, when it was announced as a closer case, Congress didn't take aim at value for restricting 1322B2. Congress opted to go with duration and to keep those short-term or near-maturity loans out of the anti-modification. Why do you say that the addition of the claim secured language in C2 necessarily means that what you call standing is available under B2? Why couldn't Congress have used a different marker in C2 than it used in B2? I think it used the same marker because that's the starting point for assessing who qualifies for protection under B2, a party who is the holder of a claim secured by. It's repeating that language because that defines the party which we're concerned about. It's not the holder of a secured claim. It's the holder of a claim secured by. So by repeating that phrase from B2, Congress said it parallels. I'm out of time, Your Honor. Thank you for your argument. We appreciate both counsel appearing today, and we will file an opinion in due course. The case is submitted.